In re NATIONAL LOCK CO.

COMPTON et al. v. NATIONAL LOCK CO.
NATIONAL LOCK CO. v. ROSENGARD.

Nos. 5581, 5586, 5647.

Circuit Court of Appeals, Seventh Circuit.
April 10, 1936.

Rehearing Denied April 13, 1936.

Charles M. Polk, of St. Louis, Mo., and John D. Black and Harold A. Smith, both of Chicago, Ill., for Compton and others.

Roy F. Hall and Wm. R. Dusher, both of Rockford, Ill., for National Lock Co.

Myer N. Rosengard, of Chicago, Ill., in pro. per.

Before SPARKS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

SPARKS, Circuit Judge.

These appeals are from a decree of the District Court in a reorganization proceeding under section 77B of the Bankruptcy Act (11 U.S.C.A. § 207). The bases of the first appeal, Cause No. 5581, are (1) the court's refusal to award any allowance for services to the Bondholders' Protective Committee; (2) the court's refusal to award any allowance to that committee's attorneys for services rendered prior to the negotiations alleged to relate to the reorganization; and (3) the reduction of the allowance of $12,000 by the Master to Charles M. Polk to $8000.

The National Lock Company, debtor, was a Delaware corporation whose principal place of business was in Rockford, Illinois. On February 16, 1925, it executed and delivered to the Mississippi Valley Trust Company of St. Louis, as trustee, hereinafter referred to as the Trust Company, its mortgage deed of trust to secure an authorized issue of $2,500,000, par value, first mortgage bonds. Only $2,000,000 of the bonds were issued, of which the debtor had retired $794,700 by February 1, 1932. The debtor defaulted on $198,000 of the bonds maturing on the last named date, although it paid the interest due on the entire issue by August 1, 1932. On February 1, 1933, the debtor defaulted in the payment of $180,000 of the bonds then maturing, and in payment of the interest then due on all the outstanding bonds.

On March 1, 1932, a Bondholders' Protective Committee was voluntarily formed, consisting of William R. Compton, Jr., Nelson B. Gatch, John R. Longmire, E. L. Roy, and Benjamin R. Frick, Jr., and that committee employed the law firm of Polk and Williams, of which appellant Charles M. Polk was a member, to act as its counsel, and also employed Orville Grove as secretary of the committee.

Compton was a member of the Compton Company, an investment firm of St. Louis, which had taken forty percent of the original underwriting of the bond issue, the remaining sixty percent having been taken by the Trust Company. Gatch was a partner in an investment house that sold a number of the original issue of bonds. Longmire was head of the bond department of the Trust Company when the bonds were originally sold, but was not connected with it at the time the committee was formed. Frick and Roy were respectively manager and sales manager of the Trust Company's bond department at the time the committee was organized and at all times thereafter. Grove during the entire time in question was a regular salaried employee of the Trust Company. Frick initiated the organization of the committee, and joined Compton with him in the enterprise, it is said, in order to protect their customers who had purchased the issue. At the time the reorganization was originally proposed, the Trust Company owned $41,800 of the bonds. It purchased none of the debtor's bonds during the period after the default, but through foreclosure of collateral held by the Trust Company, it subsequently became the owner of an additional amount of the bonds in the sum of $33,000, making a total of $75,000.

It was understood by Frick, Roy and Grove that whatever compensation for services might be allowed to them would go to the Trust Company, because their services were compensated by the salaries which they received from that Company. Longmire, Gatch and Compton, however, were to retain whatever might be allowed to them for their services.

Of the outstanding bonds amounting to $1,205,300, par value, there was final-

ly deposited with the committee the par value amount of $1,080,800, by more than 700 holders. In June, 1932, a bill was prepared to foreclose the deed of trust, but the committee decided not to file it.

On September 16, 1933, Joseph Edidin, who claimed to own $1500 par value of said bonds, filed suit in the state court at Winnebago County, in which Rockford is situated, praying for a receiver, the foreclosure of the deed of trust, and for an injunction to prevent the debtor, its directors and officers from conducting its business and affairs.

On October 13, 1933, Edidin filed another suit against the debtor and the Trust Company seeking much the same relief against the debtor as before, and also seeking to have the Trust Company removed as trustee, and to enjoin the debtor and the Trust Company from acting in any capacity with respect to the debtor's bonds.

On October 19, 1933, one Nelson, a stockholder of the debtor, filed a bill for a general receiver for the debtor in the Chancery Court of Delaware, wherein he alleged waste and mismanagement on the part of the debtor, and defaults under the terms of the trust deed. In this action the committee desired to intervene and join in the demand for a general receiver. Under the terms of the trust instrument it could not do so until after a refusal of the trustee to foreclose the trust deed, or its failure for an unreasonable time to do so after written notification of the debtor's continuing default, and after a written request upon the trustee to take such action, signed by the holders of one-fifth of the amount of the then outstanding bonds, and after such requesting bondholders had satisfactorily indemnified the trustee for all expenses and costs of the foreclosure.

In order to bring about such a state of facts, the committee in writing notified the trustee of the debtor's default and requested it to declare all of the bonds due, and to proceed to foreclose the trust deed, and it further indemnified the trustee to its satisfaction. Thereupon, on January 20, 1934, the committee, through its counsel, induced the trustee to declare all the bonds due, but not to foreclose the trust deed. This in effect permitted the bondholders as simple contract creditors to sue for a receiver without joining the trustee, or to accomplish the same purpose by intervening in Nelson's action in Delaware. Accordingly, the committee intervened in the Nelson case and joined in his prayer for a receiver. This was done in order to eliminate the debtor's right of redemption upon sale of the property. Very soon after this intervention the debtor filed suit in the Circuit Court of Winnebago County, Illinois, against the trustee, the committee, and Nelson, seeking to enjoin those defendants from proceeding further with the Delaware suit. The injunction was granted and remained in force until final approval and disposition of the reorganization plan, at which time the two Edidin suits, the Nelson suit in Delaware, and the debtor's suit for injunction were dismissed at the cost of the debtor in accordance with the terms of the reorganization agreement.

The firm of Marvel, Morford, Ward and Logan of Delaware represented the committee in the Nelson suit. The firms of Winston, Strawn and Shaw, and Lathrop, Lathrop, Brown and Lathrop represented the committee in the injunction suit instituted by the debtor. None of these firms performed any services in connection with the reorganization plan, and none petitioned directly for fees, but their fees were requested as expenses of the committee.

In March, 1934, appellee through its attorney sought an agreement with the committee for an extension of time for the payment of the bonds. Various conferences were had, but without agreement. At this time section 77B of the Bankruptcy Act was pending before Congress and its passage seemed quite probable. It was determined, therefore, that a reorganization of the debtor would be attempted thereunder, if and when it should be enacted. Pending the enactment, further proceedings in the four suits mentioned were held in abeyance. The law was enacted on June 7, 1934, and on June 18, 1934, the debtor filed its petition for reorganization under it. The court on June 21, 1934, found that the petition was in proper form and filed in good faith, and on July 11, 1934, the debtor filed its proposed plan for reorganization. The committee intervened by leave of court and subsequently agreed with appellee on a plan. However, certain intervening stockholders objected to it as did Edidin. The modified plan which was finally adopted was approved by the court on April 6, 1935.

■ The committee filed a claim for the services of its five members and its secretary in the sum of $12,000, which the master recommended be disallowed. He concluded that the members of the committee and the secretary were not justified in making charges for their services because the committee was a volunteer, formed for the purpose of protecting the interests of the holders of the bonds which had been sold to them by the organizations of companies with which the members of the committee had been and were then connected under salary or other compensation. He further found that there was no necessity for a committee of five members and a secretary. The committee's claim also included its estimated expenses in the sum of $500 contemplated in the consummation of the approved plan. It also included $1946.23 for reimbursement to the Trust Company for out of pocket expense. The master recommended the allowance of these last two items upon accounting to the debtor for the former when the plan was consummated. The court allowed the committee's claim for reimbursement to the Trust Company, but disallowed the other two items. With respect to the estimated item of $500 the court said there was no basis for estimating any further expense of the committee because there was nothing further for it to do. That ruling was clearly right.

In disallowing the committee's claim for services the court gave no reasons for the ruling but approved the master's recommendation in that respect. It made some general observations, however, which are supported by the record, and which are quite pertinent in the consideration of all the claims now before us. The claims for all fees and expenses aggregated $80,620.21, which seemed to the court to be unconscionable and out of all proportion to the services in the reorganization proceeding. The court thought that the claims revealed an effort to load the debtor with counsel fees and expenses, incurred in litigation against the debtor prior to the institution of the debtor proceeding, which had no bearing on that proceeding. The court said there had been much needless waste of energy in the reorganization matter; that from its inception to March, 1935, the proceeding on the part of the debtor was conducted as an adversary proceeding, in which the stockholders' efforts to participate were met with many obstructive and dilatory tactics; and that after their rights were recognized, the stockholders wasted much time and energy in futile and unnecessary hearings before the master which in part were intended to aid the private interests of some of the stockholders.

We think it must be conceded that the membership of the committee was larger than necessary. It is not denied that most of the committee's work was done by the two members and the secretary who were then employees of the Trust Company, and that Frick and the secretary did most of that. There were only two occasions when the committee was authorized by the court to represent the bondholders in the reorganization proceedings: (1) To file a claim for those they represented, and (2) to consent to and approve the plan. From the record, it is obvious that after the reorganization proceedings were begun, practically all of the work of the committee, aside from mere secretarial work, was borne by its attorney, Mr. Polk.

■ It seems clear to us that the District Court was right in refusing the committee's claim for services. Frick, Roy and Grove during all the times in question received their usual compensation from the Trust Company, as its employees, with the understanding that they would turn over to their employer their shares in whatever allowances might be made to them by the court. It was understood by the committee that of the allowance made to it, the Trust Company should receive one-half of two-thirds, plus one-third for incidentals, overhead, and the use of its force. In other words, the Trust Company was to receive two-thirds, and the three members of the committee who were not employees of the Trust Company were each to receive one-ninth. This agreement was had notwithstanding the statement in the affidavit to the claim that the committee would not turn over any part of its fees to any other person, firm, or corporation. Such an affidavit is required by the rules in bankruptcy, with respect to allowances for fees to attorneys, receivers and trustees, and we see no reason why a court of equity should not apply the same principle with respect to bondholders' protective committees. It is urged, however, that the Trust Company was entitled to be reim-

bursed for the services of their employees to whom it had paid compensation. One answer to this is that it filed no claim for such reimbursement. Another answer is that the court made allowances to it for acting as trustee under the trust deed in the sum of $1705.30; for services as depository the sum of $3068; and to the committee for reimbursement of the Trust Company, for expense, the sum of $1946.-13. The District Court no doubt thought these sums were sufficient to fully cover its services and all of its expenses, and that conclusion is justified by the record.

■ The activities of the committee in other respects, we think, precludes it from receiving compensation from the debtor's estate. One of the main purposes of the enactment which we are now considering was to enable a hard pressed debtor, such as we have here, to rehabilitate itself. As an inducement to all interested parties to participate in the accomplishment of that purpose it provided that the court "may allow a reasonable compensation for the services rendered and reimbursement for the actual and necessary expenses incurred in connection with the proceeding and the plan by officers, parties in interest, depositaries, reorganization managers and committees or other representatives of creditors or stockholders, and the attorneys or agents of any of the foregoing and of the debtor." Section 77B (c) (9) of the act, 11 U.S.C.A. § 207 (c) (9). The adverse interests of the parties here named are quite apparent, and we construe the meaning to be that if any of the parties or groups named shall materially contribute to the formation, the adoption, or the accomplishment of the adopted plan they should receive from the debtor's estate a fair compensation for such services and for the expense incurred thereby. Congress very wisely considered that creditors, although their interests in a certain sense are always adverse to their debtor's estate, might look with favor upon a plan of reorganization, and materially assist in its consummation which would be of mutual benefit to all parties concerned. Time has abundantly justified the enactment, for creditors as a rule have kept the faith which Congress expressed.

The reason for the inducement as provided in subsection (c) (9) impliedly negatives the idea that any one should be compensated for assisting in the reorganization unless he rendered assistance. No creditor or its agent is bound to render such assistance. Indeed, he may if he chooses, antagonize the procedure at every step, but he can not receive allowance for services or expense under this statute unless he materially contributes to the rehabilitation. That must be the consideration for the burden placed by Congress upon the debtor.

The committee was voluntarily organized for the benefit of the bondholders and for the employers of the members of the committee, or those who had formerly employed them. As such, its interests were adverse to the debtor, yet under this statute it had a right to assist, or not, in the rehabilitation of the debtor. From this record it can not be said that the committee lent any assistance to the debtor's reorganization prior to the enactment. Its chief effort up to that time was to procure a sale of the property under a general receivership which would have effectively barred the debtor's right of redemption. In a certain sense, such procedure no doubt would have resulted in a reorganization but not in the sense contemplated by the statute, for there would have been liquidation, rather than rehabilitation. Had it not been for injunctive relief granted by the Illinois State court prior to the bankruptcy enactment, we are justified in believing that a sale would have occurred. Even though such activities were lawfully within the committee's rights, yet it can not be said that it was performed in aid of the debtor or its rehabilitation, but rather in aid of the bondholders among which was the trustee under the trust deed. Whatever may be said in favor of the committee's conduct in requesting the trustee to refuse to foreclose the mortgage in order to give the committee a right to intervene in the Delaware court and ask for a receiver, we feel sure that the trustee should have considered such request with great caution, especially if there were a reasonable probability that there was or would be a valuable existing equity. The bondholders and debtor alike had reposed trust in its agreement to protect the rights of each without preference. See White v. MacQueen, 360 Ill. 236, 195 N.E. 832, 98 A.L.R. 1115. There was nothing in that agreement which required the trustee to do any act which would aid the bond-

holders in eliminating the debtor's right of redemption other than by the terms of the statute under which the trust deed was executed. It is true that precarious conditions then prevailed, and values were very uncertain, but the fact remains that within a very short time section 77B was enacted and under its provisions the debtor was rehabilitated, and from this, we are justified in concluding that there was a reasonable probability of a substantial equity in the debtor which at all times should have been protected.

For the reasons stated, we feel the court was right in refusing the committee's claim for its services. Its claim for services for its attorneys, Marvel, Morford, Ward and Logan; Winston, Strawn and Shaw; and Lathrop, Lathrop, Brown and Lathrop, we also think were properly disallowed because such services had nothing to do with the reorganization.

With respect to the claim of Charles M. Polk, it may be said that no one rendered more service than he, but it is obvious that much of it had nothing to do with the reorganization plan to rehabilitate the debtor. We do not think that services contemplated by the Act must necessarily be measured from the date of the enactment. If prior to that time services had been rendered by a party in the manner and for the purpose as contemplated by the statute, we think the enactment is sufficiently broad to cover compensation for such service and the expense incident thereto. The statute fixes no definite time, applicable to all cases of this kind, nor can the courts fix such time, beyond which such allowances can not be made. That must depend upon the respective conditions of each case. The amount to be allowed, if at all, is directed to the sound discretion of the trial court, and we should not interfere with the exercise of that discretion unless its abuse is clear. The disclosures of this record convince us that there was no abuse in this respect, but that the amount allowed this claimant is sufficient to fairly compensate him for all services contemplated by the statute, rendered by him both before and after the enactment.

Appellee in Cause Nos. 5586–5647, Myer N. Rosengard, appeared in the proceedings as attorney for Edidin, who claimed to be the holder of the debtor's bonds of the value of $1500. Their maturity date was extended in the reorganization proceedings. His claim for services was for the sum of $3000 and for expenses incident thereto in the sum of $135.20. The master allowed his claim for expenses, and $750 for his services. The District Court approved these allowances on July 12, 1935.

The appeal in this case was granted by the District Court, and as a matter of precaution, appellant presented its petition to this court for permission to appeal under section 24b of the act, 11 U.S.C.A. § 47 (b). It was granted by one member of this court, and the appeals were consolidated. The irregularity of a single judge of this court granting the appeal under section 24b was subsequently cured, prior to the hearing of the cause. See In re Paula Hoffman, 82 F.(2d) 58, decided by this court on February 26, 1936.

It is not contended by appellant, the debtor, that the allowances to Rosengard were excessive providing he was entitled to recover anything. It is urged by appellant, however, that appellee was not entitled to recover anything because (1) Edidin was not the owner of the bonds which he held, (2) Edidin was not a creditor of the debtor, and (3) Edidin was not entitled to represent the owner without fully disclosing the name of the owner and informing the court specifically as to the nature and character of the agency claimed and the extent of his authority in connection with the bonds.

The first proviso of section 77B (b) of the act, 11 U.S.C.A. § 207 (b) states that for all purposes of the section any creditor may act in person, by an attorney at law, or by a duly authorized agent or committee. The second proviso follows with the statement that the judge shall scrutinize and may disregard any limitations or provisions of any authorizations affecting any creditor acting under the section. Under this section it is obvious that Edidin was not required to be the owner of the bonds in question. They were negotiable by delivery, and his possession would imply ownership, or he could establish agency under such possession, subject, however, to the scrutiny of the court, and as such agent he would be considered a creditor of the estate.

Appellant, however, contends that Edidin could not thus act as the owner's

agent without fully disclosing the owner's name and fully informing the court as to the nature, character, and extent of the agency. His right to act either as holder or agent was challenged both before the master and the court on the ground that Edidin was not the holder and owner of the bonds in good faith, but that they were held in his name for the purpose of covering up the real ownership and of annoying and harassing the debtor. Rosengard thereupon testified before the master that Edidin was not the owner of the bonds and had no financial interest in them; that the real owner was a client of his who for reasons best known to himself would not wish his name disclosed. He further stated,

"I have before me in open court today photostatic copies of the bonds in question. Mr. Edidin was at the time of the filing of the petition in my employ; he is an attorney at law, licensed to practice in the State of Illinois. These bonds were bought by a client of mine some time in the year 1926 or 1927 from the Foreman-State Corporation of Chicago. This man has been a client of mine for the past fifteen years and is now a client of mine. It can be easily ascertained by anyone having any vital interest in the matter as to the purchaser of these bonds from the place of purchase."

No steps were taken by either the appellant or the master to compel a disclosure of the owner's name. From a reading of this record we think there was no sound reason why appellant should have objected to the failure to disclose, and there was no better reason why the disclosure should not have been made. It was a trivial matter which had nothing whatever to do with the merits of the case, and we are justified in concluding that the master so considered it, after scrutinizing the matter to his satisfaction. He allowed appellee his expense account and one-fourth of his claim for services, and those allowances were confirmed by the court. It is true that the court in its memorandum opinion, filed nine days prior to the decree, stated that the claim would be disallowed as a violation of Equity Rule 37, 28 U.S.C.A. following section 723, which provides that every action shall be prosecuted in the name of the real party in interest. That rule further provides that a party expressly authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought. Under the statute above referred to, we think the court concluded properly in the decree.

This entire proceeding reeks with acrimony, and it has caused much more labor than otherwise would have been necessary. The plan was approved, however, after many conferences in which both the debtor and Rosengard participated, and the former agreed to pay all allowances made by the court. This, of course, would not preclude it from resisting unlawful allowances, or those resulting from abuse of discretion. Those conditions we think are not present.

Decree affirmed.