**In re MARINE MAINTENANCE CORPO-RATION (four cases).**
**Nos. 9894, 9911, 9930, 9968.**

United States Court of Appeals
Third Circuit.

Argued Oct. 6, 1949.

Decided March 28, 1950.

Thomas P. Mesick, New York City, for Marine Maintenance Corp.

Edward R. McGlynn, Newark, N. J., (McGlynn, Weintraub & Stein, Newark, N. J., on the brief), for trustee.

Theodore J. Breitwieser, New York City, for Ferend.

Abraham Hornstein, New York City (Garey & Garey, New York City, on the brief), for Granik.

Before McLAUGHLIN and O'CONNELL, Circuit Judges, and FEE, District Judge.

McLAUGHLIN, Circuit Judge.

These matters embrace four separate appeals in a Chapter Ten reorganization proceeding.

The first appeal is by the Trustee from the amount of fees awarded him and from two surcharges against him.

Edward R. McGlynn was one of two trustees appointed in this matter on February 23, 1943. The other trustee resigned on October 11, 1943, and McGlynn thereafter functioned alone. The Debtor owned and operated a shipyard in Bayonne, New Jersey. On February 18, 1943, just prior to the Trustee's appointment, the Government took possession of the shipyard pursuant to an order of possession in a related condemnation proceeding. That possession was not relinquished until March 15, 1945. Thereafter, the Trustee leased the yard to a new corporation. He never actually operated the shipyard himself.

The Referee found that the administration of the Chapter Ten proceeding was extremely successful. A plan of reorganization was confirmed by order of June 26, 1947, and the shipyard was returned to the Debtor with a cash working capital of $150,000.

At the time of the appointment of the trustees, the United States had instituted condemnation proceedings against all of

the Debtor's real and personal property (cash, accounts receivable and choses of action excepted). An indictment had been returned against the Debtor, its president and treasurer. This involved numerous charges of fraud in connection with work performed and materials furnished the Maritime Commission. There was also pending a civil action by the Government for penalties arising out of the criminal charges.

The Trustee assisted his attorneys materially in the criminal trial. That case lasted eight weeks and resulted in acquittals of the Debtor and its president, and in the conviction of the treasurer. The treasurer's conviction was later reversed on appeal. The Trustee also rendered important help in various matters arising out of the condemnation and in the Government's civil litigation. Throughout the period of his trusteeship it was necessary for him to maintain a bookkeeping and accounting staff to assist him in attending to the numerous details connected with preparation of the trial of the indictment, collection of accounts, settlement negotiations with the Maritime Commission, review of employees' records for the purpose of refunding of war bond deductions, processing some 550 proofs of claim, taking care of New Jersey Unemployment Compensation and Federal Social Security returns for a considerable period prior to the trusteeship and various problems regarding the financing of the Debtor.

There were approximately 170 petitions, orders, reports, stipulations and memoranda filed with the Clerk in the proceeding. The Trustee prepared most of these and participated in all of them. The trusteeship entailed voluminous correspondence. The Trustee had assistance on occasion from various members of his law office personnel and one of his associate lawyers spent practically full time on trusteeship affairs for over two years.

The Trustee filed two itemized petitions for services of 151 pages and 55 pages respectively. He was allowed a total of $25,000 for his services; $15,000 of this by way of ad interim compensation. There is a dispute between the parties regarding the correctness of the Referee's calculation of the sum available for fees and disbursements. It is not necessary for us to go into that because there is no indication that the Referee's recommendation of additional compensation to the Trustee was based on anything but the value of the latter's services. Later that whole dispute was aired before the District Judge on the Trustee's specific exception to that part of the Referee's report. Having considered the Trustee's petition for allowance in connection with the Referee's report and the exceptions thereto, the Court, without any qualification, found: "That the sum of $10,000.00, in addition to the allowance of $15,000.00 heretofore made, *is reasonable and just compensation* for the services rendered by Edward R. McGlynn, Esq., the Trustee, and he hereby is allowed the sum of $10,000.00 as compensation for such services, in addition to the sum of $15,000.00 heretofore allowed." (Emphasis supplied.)

■ The Trustee is an experienced lawyer. Generally speaking, he performed an excellent job of work in this tedious, exacting matter. He was instrumental in the good over-all results obtained. However, we cannot say that the sum awarded him is so unreasonable as to warrant interference by this Court. Dickinson Industrial Site v. Cowan, 309 U.S. 382, 389, 60 S.Ct. 595, 84 L.Ed. 819; In re Standard Gas & Electric Co., 3 Cir., 106 F.2d 215, 216; Newman v. Ambassador Apartments, Inc., 3 Cir., 101 F.2d 307, 308; Oklahoma Ry. Co. v. Johnston, 10 Cir., 155 F.2d 500, 502; In re Long Island Properties, Inc., 2 Cir., 150 F.2d 313, 314.

■ The two surcharges against the Trustee present a radically different situation. The first involves weekly payments by him to his chief accountant in reimbursement to the latter for expenses incurred and payments made by him in the discharge of his duties. These totalled $1,340.08. The Court found that the payments "cover expenses necessarily incurred by the Trustee in the discharge of his duties * * *." (Emphasis supplied.) But because the Court felt that if it al-

lowed the payments it would be lending its approval to the "bad accounting practice" of "paying the sums without supporting vouchers or receipts" the Court sustained this exception to the Trustee's account.

We agree that the method, or lack of method, displayed by the Trustee in this very minor phase of a business reorganization in which he handled total cash receipts of $3,534,700.68 and disbursed $3,468,954.33, was slipshod and deserving of censure. But in the light of the finding that the payment covered expenses necessarily incurred by the Trustee in the discharge of his duties, we do not think the surcharge warranted. He has not been found in positive fault, Gutterson & Gould v. Lebanon Iron & Steel Co., C.C.MD.Pa., 151 F. 72, 75, 77, 78, or negligent. In re Lambertville Rubber Co., 3 Cir., 111 F.2d 45, 50; In re Schoenfeld et al., 3 Cir., 183 F. 219, 221. Since the District Judge in both his memorandum opinion and his order has given clear expression to the thought that he does not approve of the Trustee's accounting practice, which is the Court's sole reason for the surcharge, and since this phase of the matter was before the Court for the first time with no opportunity of warning the Trustee that his method was frowned upon, it does seem that the surcharge is too drastic a remedy, reflecting as it does upon the Trustee in a manner not supported by the findings.

The second surcharge concerns a disbursement for rent. This amounts to $1,725.00 at the rate of $50 a month. It was paid for an unused room in the Trustee's suite of law offices. The room was available because the lawyer who had occupied it was in the Army. Office space was admittedly almost impossible to obtain in the desired location. The rent for the premises during the Trustee's occupancy was paid by him directly to the landlord's agent. The Court accepted the Trustee's explanation that his only reason for taking over the particular quarters was that no other space was readily available in the years 1944, 1945 and 1946. The Court did not question the necessity of the expenditure, but because it considered that approval should have been first obtained, it made the surcharge. What the Court said was: "The third exception is directed to rents in the total amount of $1,725.00, for office space occupied by the Debtor during the period of reorganization, but formerly occupied by the Trustee. It is admitted that a monthly rental of $50.00 was paid to Albert Greenfield & Co., for this space, which was apparently released by the Trustee. The only explanation of the Trustee is that no other space was readily available during the years 1944, 1945, and 1946, and *we accept this explanation as true because we know that office space was at a premium during this period. The expenditure may have been necessary*, but it is our opinion that it should not have been made without first acquainting the Court with the necessity of making it and obtaining the Court's approval. This exception is, therefore, sustained, and the Trustee will be surcharged the amount of $1,725.00." (Emphasis supplied.)

The circumstances bringing about the use of the particular room were extraordinary. Wartime conditions had absorbed practically all convenient space. The room itself would not have been available except for those same circumstances. It was occupied for three years by the Trustee without objection from any interested person. The Trustee argues that under his broad powers, he had authority to make such expenditure without the necessity of applying for an order; that it was a proper and necessary incident to the discharge of his duties as trustee. Nevertheless, because the room had been in his law office suite it would have been far more advisable to have first presented the matter to the Court. Aside from this, there is not the slightest intimation of failure of duty or of negligence. There is no thought of bad faith and nothing to suggest that the trust estate was the loser in the transaction or that the Trustee dealt with it " * * * in such a way as to make a personal profit for himself." Magruder v. Drury, 235 U.S. 106, 120, 35 S.Ct. 77, 82, 59 L.Ed. 151. The room was convenient and obtainable. Its closeness to Trustee's law office was an advantage to the trust estate. Under all

the facts we do not think the surcharge is justified.

The second and third appeals are by the Debtor and Gregory Ferend, former president and controlling stockholder (through another corporation) of the Debtor. They urge that certain exceptions to the Trustee's account should not have been dismissed.

■ The first of those exceptions had to do with the employment of a stenographer from Trustee's law office for the use of the Trustee. The exception was dismissed by the District Court without comment. Under the order of appointment, the Trustee had the power to employ and discharge such help and the uncontradicted testimony is that, "Substantially and almost exclusively, almost to the extent of 100 per cent, she was doing Marine Maintenance work". As the Trustee further said, "It is impossible for a girl in an office to be kept exclusively within a fence with an iron curtain around her." We do not find the Trustee's judgment at fault in this instance. Nor do we find bad faith, fraud or loss to the estate.

■ Objection was also made to the Trustee having had a firm of certified public accountants prepare the estate returns for withholding taxes, Social Security and Unemployment Insurance. There was no showing of any unwarranted conduct of the Trustee in connection with this item. It need not be discussed.

The remaining exception has two independent parts. The first concerns claims of the Debtor against the Government amounting to $35,977.21 for repairs to the ships Northern Sword, Donbass and Yankee Sword. The Trustee discovered that these and twenty-eight other claims for repairs had not been billed by the Debtor. Their total came to $757,771.89. The Government refused to pay them pending the disposition of its civil false claims suit, above mentioned, which had to do with entirely different work by the Debtor for the Government. There were other, and entirely separate, repairs to the Northern Sword, Donbass and Yankee Sword which were involved in the false claims suit.

On September 7, 1944, there was a conference at Washington between the Trustee and the attorneys for the Debtor (who also represented the Trustee in the false claim litigation) and various Government people. A compromise settlement of the false claim suit was agreed upon and, in accordance with it, the Trustee was to receive $102,130.67. A stipulation covering this was agreed upon. This was drawn by the Debtor's attorney and approved by the Debtor. It was not executed immediately, as the Court's approval, on notice to creditors, was first needed. The Trustee then set out the situation in a petition to the Court. The creditors consented and there was an order authorizing the compromise filed September 25, 1944. The stipulation was executed at the same time. The stipulation stated that the Trustee would receive the $102,130.67 in full settlement for all work performed and materials furnished for the twelve ships involved in the false claim suit. In the twelve ships were included the Northern Sword, Donbass and Yankee Sword. For the agreed sum the Trustee was to execute and deliver a general release to the Commission covering all work done and materials furnished to the twelve ships.

Because of the stipulation, the Maritime Commission requested the Trustee to return checks totalling $35,977.21 which had been sent covering the bills to Northern Sword, Donbass and Yankee Sword in connection with the other claims against those ships and which checks, it was stated, had been sent by mistake. The Trustee told the Commission that "As Trustee I can't take checks you are going to stop payment on" and he returned those checks to the Commission. Regarding this the Trustee testified, "I think I would give it [the money] back to anybody who told me he had paid me by mistake and fight it out decently, as we should fight it." He then presented a petition to the Court advising that the Commission would not give him the compromise settlement money unless he in turn delivered the general release called for by the stipulation. The latter specifi-

cally referred to the particlular claims of the Debtor against the twelve ships. It did not refer to the other items against Northern Sword, Donbass and Yankee Sword which totalled $35,977.21.

The Court made an order on February 5, 1945, authorizing the Trustee to accept the $102,130.67 and to deliver a general release. In addition, the Trustee was authorized to institute a plenary suit for $35,977.21. The attorney for the Debtor, who had taken part in the compromise conference and who had drawn the stipulation, participated throughout the above detailed proceedings. The Trustee testified that he did not commence the plenary action because of specific instructions many times from the Debtor's attorney and from Ferend, who was more anxious to settle the large claim "which resulted in the confirmation of the plan". The Trustee testified that he would have started the suit "anytime they wanted me to." The claim was assigned to the Debtor. Down to the date of the argument on this appeal, suit had not been commenced.

As already mentioned, the stipulation of settlement of the false claims action referred to certain invoices by number. The three invoices amounting to $35,977.21 were not among these. Without passing on the point, the Court below was of the strong impression that the release defense could not be successfully interposed in a suit based on the three invoices and commented that if there was merit to such claims "there is nothing to prevent the Debtor from seeking to have them paid." At that time the reorganized Debtor had been in control for six months and had done nothing about the claim.

 The second half of the exception has to do with the non-obtainment by the Trustee of a Certificate of Necessity. It will be recalled that the Trustee never operated the Debtor's business. Prior to the Chapter Ten proceeding there had been an application for such a certificate by the Debtor. The certificate had to do with wartime production and operation and allowed special amortization of wartime assets. The Trustee never found anything connected with a Certificate of Necessity in the Debtor's records. After the criminal trial, included in the papers in the case returned to him by the District Attorney, there was an envelope containing a copy of an informal application for such certificate. That copy apparently had been obtained from Washington by some one acting for the District Attorney. The Trustee testified "that everybody in the case", including the Debtor's own accountant, thought that the copy of the application was the certificate. Later attempts by the Trustee to obtain a certificate nunc pro tunc were unsuccessful.

The District Court was well within its discretion in dismissing the exception. As to the first part of the exception, in compromising certain claims,[1] the Debtor's attorney had drawn a stipulation, which, while it called for a general release, was tied into specific vouchers. The consideration intended by the stipulation was not forthcoming except in exchange for the release. Under court order, the release was given. The plenary action indicated by the Court was not started by the Trustee at the request of Ferend, who did not wish any possible interference in the return of the shipyard to him under the confirmation of the reorganization plan. Later the cause of action was in the control of the reorganized Debtor. The balance of the exception has to do with an incident that had apparently occurred prior to the advent of the Trustee although there was no record of it in the files of the Debtor. The only thing the Trustee ever saw concerning a Certificate of Necessity was the District Attorney's photostatic copy of the original application which happened to come to him after the criminal trial. As the Trustee said, everybody connected with the case thought the certificate had been issued. Even after the copy of the application had been received there is no evidence that anyone connected with the

---

1. The Maritime Commission had felt so strongly about those claims, that in connection with them, the Debtor, Ferend and the corporation treasurer had been indicted and tried.

Debtor, particularly Ferend, the accountant or the Debtor's attorneys, ever gave the Trustee the slightest intimation that the application had never been approved. Certainly, under the facts, we cannot say that the District Judge acted improperly in dismissing both parts of this exception.

The final appeal is by a creditor, Theodore Granik, from an order disallowing his proof of claim. Granik is a Washington lawyer. It was well known that he had a claim for services rendered the Debtor prior to the filing of the petition for reorganization. In fact, there were eleven orders extending his time to file his proof of claim beyond the date originally fixed, namely, June 1, 1943. Those orders were consented to by the Trustee. The last of them expired April 2, 1945. On April 25, 1947, at the time the plan for reorganization was filed, the Court's order provided: "That the time for filing claims which have not been heretofore filed be extended to and including May 26, 1947." This was consented to by the attorney for the Debtor. That same order declared, "That Marine Maintenance Corporation, the above named debtor, be and it is hereby determined to be solvent."

On May 21, 1947, the Trustee received from Granik a letter dated May 20, 1947, containing an informal unverified statement of his claim. The Trustee accepted this as the filing of Granik's proof of claim, and, in a letter dated May 21, 1947 to his attorney, who had also represented the Debtor, he said, "I am sending to you herewith copy of letter received from Mr. Granik, together with the enclosures therein mentioned which letter I am to consider as a formal proof of claim of Mr. Granik and which I am filing, together with the claims of other creditors." On May 27, 1947, the Trustee wrote Granik saying, "In order that your proof of claim for services rendered prior to the appointment of a trustee is in proper form, I enclose herewith two blanks which I have filled out in accordance with the papers you have already sent me, which I wish you would have sworn to and sent back to me." These were returned to the

Trustee and filed by him on or about May 29, 1947.

We think it clear that Granik's unverified claim was accepted for filing by, and filed with, the Trustee on May 21, 1947. This was five days prior to the expiration of the time fixed for filing by the order of April 25, 1947. Though the claim was later amended by being put into formal shape and verified, it did not in any way present "a new claim or interest". Collier on Bankruptcy, Vol. 6, p. 2783. And see Collier, Vol. 3, pp. 170, 171. In the matter of In re Prindible, 3 Cir., 115 F.2d 21, 23, we said, " * * * that while the limitation in the Bankruptcy Act [11 U.S.C.A. § 1 et seq.] for the filing of creditors' claims * * * has been construed strictly with respect to an original filing * * *, when a claim has been filed within the statutory period, an amendment thereof may be allowed after the expiration of the time for filing." See In re Weco Equipment, Inc., D.C.E.D.N.Y., 55 F.Supp. 532, affirmed as Public Operating Corporation v. Schneider, 2 Cir., 145 F.2d 830, where the facts were quite similar to those at bar. See also In re Casey, D.C.S.D.N.Y., 53 F.Supp. 879. The long, and never satisfactorily explained, delay in the filing of this claim is bitterly assailed by the Debtor and by Ferend and the Debtor's subsidiary, Swordlines, Inc., as creditors. And it is urged that the claim itself actually makes no distinction between alleged services to Marine Maintenance prior to the Chapter Ten petition and those services alleged to have been rendered during the reorganization proceedings. The question of the merits, if any, of the Granik claim is not before us and we have no opinion thereon. We merely hold that the claim has been filed.

In No. 9894, the order of the District Court dated December 15, 1948, in allowing $10,000 as compensation for services to appellant-trustee in addition to the sum of $15,000 previously allowed, will be affirmed. That part of the order of the District Court dated January 5, 1949, which sustains exceptions (2) and (3) filed by Debtor to the final account of appellant-trustee, and fixing surcharges against the

Trustee with respect to the second exception in the sum of $1,340.08 and with respect to the third exception in the sum of $1,725.00 will be reversed. The order dated January 5, 1949, amending the aforesaid order of December 15, 1948, and providing for the deduction of $3,065.08 (the aggregate of the surcharges above mentioned) from the final allowance of $10,000 to appellant-trustee will be reversed.

In Nos. 9911 and 9930, that part of the order of the District Court dated January 5, 1949, which dismissed certain exceptions to the Trustee's account will be affirmed.

In No. 9968, the order of the District Court of March 28, 1949, disallowing the proof of claim of Theodore Granik will be reversed.

Judge O'CONNELL heard the argument and participated in the consideration of these cases but died before the opinion was filed.